**United States District Court**

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH KEKOA MANIBUSAN, | No. C 04-2611 JSW (PR) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS'** |
| | **MOTION FOR SUMMARY JUDGMENT,** |
| v. | **DENYING PLAINTIFF'S CROSS-MOTION** |
| | **FOR SUMMARY JUDGMENT, AND** |
| EDWARD J. ALAMEIDA, et al., | **DENYING DISCOVERY MOTION AS** |
| | **MOOT** |
| Defendants. | |
| / | (Docket nos. 16, 22, 27) |

**INTRODUCTION**

Joseph Kekoa Manibusan, a death row inmate confined at the California State Prison at San Quentin ("CSP-SQ"), filed this *pro se* civil rights action under 42 U.S.C. § 1983. Defendants have moved for summary judgment, Plaintiff has opposed the motion, and Defendants have filed a reply. Plaintiff also has filed a cross-motion for summary judgment, which Defendants have opposed. For the reasons discussed below, the Court concludes that Defendants are entitled to judgment as a matter of law on Plaintiff's complaint and grants Defendants' motion for summary judgment and denies Plaintiff's cross-motion for summary judgment.

**BACKGROUND**

This action concerns Plaintiff's placement and retention in administrative segregation as a gang member. The following facts are undisputed unless otherwise noted.

California Department of Corrections ("CDC") administrators believe prison gangs pose a severe threat to the safety and security of California prisons. Prison gangs are responsible for murders, assaults and extortion within and outside California's prisons.

Inmates who are thought to be gang members are investigated and, if deemed to meet the requirements in Title 15, California Code of Regulations section 3378, are validated as gang members and put in administrative segregation ("ad-seg") in a security housing unit

**United States District Court**

For the Northern District of California

1  ("SHU").[1]  The general process of identifying and validating a prison gang member is

2  described in Defendants' motion for summary judgment and the supporting declaration of

3  John Thompson, a correctional officer at CSP-SQ assigned to the prison Investigative

4  Service Unit ("ISU"), which is located in the same office as the Institutional Gang

5  Investigations Unit ("IGIU").  As part of his job, Thompson assists the IGIU in gathering and

6  maintaining information regarding prison gangs and gang activities at CSP-SQ, and

7  evaluating the gang status of individual inmates at the prison.

8      Active gang members are identified through the "validation" process.  Each CDC

9  institution has an Institutional Gang Investigator ("IGI") who tracks gang activities and

10  investigates those suspected of prison gang affiliation.  Any evidence of gang activity or

11  affiliation collected by the IGI is noted in the inmate's central file.  Validation of an inmate as

12  a gang member or associate requires a minimum of three original, independent source items

13  of documentation indicative of association with validated gang members and/or associates.

14  Generally, the practice is to rely on at least some information provided by a confidential

15  informant.  However, California regulations preclude reliance on such statements unless

16  other documentation corroborates information from the source, or unless the circumstances

17  surrounding the event and the documented reliability of the source satisfies the decision

18  maker that the information is true.  Once the IGI believes there is sufficient documentation to

19  validate an inmate as a prison gang affiliate, he prepares a validation package for submission

20  to the Law Enforcement and Investigative Unit ("LEIU") in Sacramento.  If confidential

21  information is relied upon, the prisoner is provided with a Confidential Information

22  Disclosure Form which briefly summarizes the substance of the accusation, insofar as that

23  can be done without disclosing the informant's identity.

24      Once an inmate is validated as a prison gang member or associate by the LEIU, the

25  Institution Classification Committee ("ICC") determines whether the inmate should be

26

27

28      [1]Gang associates, who apparently have weaker ties with the gangs than do gang members, also are subjected to the validation process.  Because Plaintiff was validated as a gang member, this order discusses only gang members.

**United States District Court**

For the Northern District of California

retained in ad-seg and given an indeterminate SHU term based on his gang affiliation.  An indeterminate SHU term means that the inmate will remain in the SHU for the duration of his prison term unless he drops out of the gang.  Although the ICC does not, as a general matter, reexamine the underlying bases of the validation, the inmate is brought to the ICC and given an opportunity to address the committee before a final decision on his SHU placement is made.

Plaintiff was validated as a member of the Northern Structure  ("NS") prison gang on December 3, 2002, and consequently the ICC on December 12, 2002, assigned him to the CSP-SQ "adjustment center," which is the equivalent of the SHU at other prisons.  The validation decision was based on information contained in a validation package consisting of (1) a confidential memorandum authored by Defendant Correctional Officer Deseo, dated July 23, 2002 (Declaration of Denise Dull in Support of Motion for Summary Judgment Ex. F (submitted separately under seal)), (2) a CDC 128-B chrono authored by Defendant Correctional Officer Nakamura, dated August 12, 2002 (Dull Decl. Ex. G), and (3) a CDC 128-B chrono also authored by Defendant Correctional Officer Nakamura, dated September 3, 2002 (Dull Decl. Ex. H).

The confidential memorandum dated July 23, 2002, which has been filed under seal and which the Court has reviewed *in camera*, stated that a confidential reliable informant told staff that Plaintiff had been recruited into the NS and was an active NS member, and how Plaintiff's status as a condemned inmate allowed him to be active in the NS.

The August 12, 2002, chrono stated that Defendant Correctional Officer Nakamura had reviewed an outgoing letter written by inmate Gabriel Martinez, a validated NS prison gang member in East Block ad-seg.  The letter was addressed to Dora Ybarra of Modesto, California.  In the letter, Martinez asked Ybarra to send him a package in his friend's name. He wrote that his friend's name was "Joseph (Joe)," and included in the letter a form for sending packages to condemned inmates.  The sender's name section of the form had the name Dora Ybarra, and the recipient section of the form was filled out "To: Joseph Manibusan, T-06046."  From this information, Nakamura concluded that Plaintiff was

3

communicating with NS prison gang members and/or associates in the East Block of the prison, and that this could be used as a direct link for validating Plaintiff as a member or associate of the NS.  (Dull Decl. Ex G.)

The September 3, 2002, chrono, also authored by Nakamura, stated that he had reviewed an outgoing letter from inmate Carlos Ballardo, a validated NS member housed in Carson Section, to Alicia Ballardo of Fairfield, California.  The letter included the statement, "Give this hook-up to Dennis and tell him I said if he can send $35.00 and I'll give it back my first day out and tell him gracias!  Joseph Manibusan T-06046."  From this, Nakamura concluded that Plaintiff was actively communicating with NS members and/or associates and that this could be used as a direct link for validating Plaintiff as a member or associate of the NS.  (Dull Decl. Ex. H.)

On November 19, 2002, a confidential information disclosure form, also known as a CDC 1030 form, regarding the confidential information used to validate Plaintiff's gang status, was placed in Plaintiff's prison central-file and made available for his review.  The confidential memorandum itself was placed in the confidential part of his file and was not made available for Plaintiff's inspection.  Copies of Nakamura's chronos were also placed in Plaintiff's central file when they were written and copies were given to Plaintiff.

On November 14, 2002, Gang Coordinator/Investigator Lt. K. Brandon filled out a CDC form 812, also know as a gang validation package, which starts the process for identifying an inmate as a gang member.  On the form he listed the three pieces of information in Plaintiff's file.  On November 19, 2002, Correctional Officer J. Thompson, of the IGIU, filled out a Gang Status Review memorandum and wrote that the three pieces of information in Plaintiff's file indicated that Plaintiff was a member of the NS.  On December 3, 2002, LEIU reviewer D.T. Hawkes conducted a Gang Validation/Rejection Review of the three documents in Plaintiff's file and found that they met the validation requirements of Title 15 of the California Code of Regulations section 3378, and validated Plaintiff as a member of the NS prison gang.  (Dull Decl. Ex. E.)  On December 12, 2002, Plaintiff appeared before the ICC for a Program Review.  He was told that based upon his recent validation as a NS

4

**United States District Court**

For the Northern District of California

1   member he would be housed in the CSP-SQ adjustment center.  He was told of his option to

2   debrief, and was informed that he could appeal the ICC's decision.  According to the notes of

3   the ICC chairperson, D. Wooten, Plaintiff indicated he understood and had no questions.

4   (Dull Decl. Ex. J.)  Plaintiff appealed his validation as a member of the NS through all three

5   levels of administrative review.

6        Because a prisoner who is labeled as a gang member generally remains in ad-seg until

7   he paroles, debriefs or dies, Plaintiff may remain in ad-seg for the rest of his life term unless

8   the decision to categorize him as a gang member is set aside.  Plaintiff has remained in the

9   adjustment center since December 2002.

10                          **STANDARD OF REVIEW**

11       The court will grant summary judgment "against a party who fails to make a showing

12  sufficient to establish the existence of an element essential to that party's case, and on which

13  that party will bear the burden of proof at trial . . . since a complete failure of proof

14  concerning an essential element of the nonmoving party's case necessarily renders all other

15  facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Anderson*

16  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (a fact is material if it might affect the

17  outcome of the suit under governing law, and a dispute about a material fact is genuine "if

18  the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

19       Generally, the moving party bears the initial burden of identifying those portions of

20  the record which demonstrate the absence of a genuine issue of material fact.  The burden

21  then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or

22  by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts

23  showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

24       The court's function on a summary judgment motion is not to make credibility

25  determinations or weigh conflicting evidence with respect to a disputed material fact.  *See*

26  *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The

27  evidence must be viewed in the light most favorable to the nonmoving party, and the

28  inferences to be drawn from the facts must be viewed in a light most favorable to the

                                 5

**United States District Court**

For the Northern District of California

1  nonmoving party. *See id.* at 631.

2                              **DISCUSSION**

3  I.        Defendants' Motion for Summary Judgment

4          The Due Process Clause of the Fourteenth Amendment of the United States

5  Constitution protects individuals against governmental deprivations of life, liberty or

6  property without due process of law.  Changes in conditions of confinement for a prison

7  inmate may amount to a deprivation of a constitutionally protected liberty interest, provided

8  that the liberty interest in question is one of real substance. *Sandin v. Conner*, 515 U.S. 472,

9  477-87 (1995).  As Plaintiff has noted, in *Wilkinson v. Austin*, 125 S. Ct. 2384, 2394-95

10 (2005), the Supreme Court held that indefinite placement in Ohio's "supermax" facility

11 imposes an "atypical and significant hardship within the correctional context."  Because

12 indefinite placement in California's SHU imposes deprivations similar to those discussed in

13 *Wilkinson*, it appears that California prisoners might have a liberty interest in not being

14 placed indefinitely in the SHU. *Accord id.* at 2395 (necessity of harsh conditions in light of

15 danger that high-risk inmates pose to prison officials and other inmates does not diminish

16 conclusion that conditions rise to a liberty interest in their avoidance).  The Court need not

17 decide whether this is the case, however, because even if an atypical and significant hardship

18 was imposed, Plaintiff received all of the due process to which he was entitled.

19         When prison officials initially determine whether a prisoner is to be segregated for

20 administrative reasons and a liberty interest of real substance is implicated, due process

21 requires that they hold an informal nonadversary hearing within a reasonable time after the

22 prisoner is segregated, inform the prisoner of the charges against him or the reasons

23 segregation is being considered, and allow the prisoner to present his views. *Toussaint v.*

24 *McCarthy*, 801 F.2d 1080, 1100 (9th Cir. 1986), *cert. denied*, 481 U.S. 1069 (1987).  Due

25 process also requires that there be an evidentiary basis for the prison officials' decision to

26 place an inmate in segregation for administrative reasons. *Superintendent v. Hill*, 472 U.S.

27 445, 455 (1985); *Toussaint*, 801 F.2d at 1104-05.  This standard is met if there is "some

28 evidence" from which the conclusion of the administrative tribunal could be deduced.

6

1  *Superintendent v. Hill*, 472 U.S. at 455; *Toussaint*, 801 F.2d at 1105.  The "some evidence"

2  standard applies to an inmate's placement in SHU for gang affiliation.  *See Bruce v. Ylst*, 351

3  F.3d 1283, 1287-88 (9th Cir. 2003).[2]

4       Plaintiff alleges that his right to due process was violated because he did not receive

5  proper notice prior to his validation that he was under investigation by the IGIU for gang

6  association or membership, he never received a copy of the validation packet used against

7  him, and he was not given an opportunity to confront the evidence against him and to

8  present his views.  However, due process in this context requires only that the prisoner be

9  notified of the reasons for the segregation and provided an informal hearing within a

10  reasonable amount of time--it does not require detailed written notice of charges or a written

11  decision describing the reasons for placing the prisoner in administrative segregation.  *See*

12  *Toussaint*, 801 F.2d at 1101; *see also Munoz v. Rowland*, 104 F.3d 1096, 1098 (9th Cir.

13  1997) (the more stringent procedural protections required by *Wolff v. McDonnell*, 418 U.S.

14  539 (1974), for disciplinary decisions are not necessary because placement in the SHU for

15  gang affiliation is done as administrative segregation rather than disciplinary segregation);

16  *accord Wilkinson*, 125 S. Ct. at 2397 (determining that prisoners are constitutionally entitled

17  only to the informal, non-adversary procedures set forth in *Greenholtz v. Inmates of Neb.*

18  *Penal and Correctional Complex*, 442 U.S. 1 (1979), and *Hewitt v. Helms*, 459 U.S. 460

19  (1983), prior to assignment to "supermax" facility).  Here, it is undisputed that the pieces of

20  information relied upon to validate Plaintiff as a gang member, with the exception of the

21  confidential informant memorandum itself, were placed in his file and were available to him

22  for viewing, and that copies of the CDC 1030 form and the CDC 128-B chronos were

23  provided to Plaintiff.  A copy of the LEIU's decision validating him as a gang member also

24

25

26       [2]There is some authority for the proposition that the evidence relied upon to confine an inmate to the SHU for gang affiliation must have "some indicia of reliability" to satisfy due process requirements. *See Madrid v. Gomez*, 889 F. Supp. 1146, 1273-74 (N.D. Cal. 1995); *see*

27  *also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990), *cert. denied*, 502 U.S. 874 (1991) (considering accuracy of polygraph results when used as evidence to support placement

28  in administrative segregation); *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987) (evidence relied upon by a prison disciplinary board must have "some indicia of reliability").

*United States District Court*

For the Northern District of California

1   was placed in his file.  All of these were available to be viewed by Plaintiff prior to the

2   December 12, 2002, ICC hearing.

3       Plaintiff also argues that he was unable to present an effective defense because he was

4   not allowed to see the confidential memorandum relied upon to validate him.  Defendants

5   state that the memorandum contains confidential information that, if disclosed to the inmate,

6   would present a grave security risk to the inmates identified in the memoranda and harm the

7   prison staff's efforts to thwart prison gangs.  Even in the disciplinary segregation context--

8   where procedural protections are greater--the Supreme Court has indicated that the level of

9   specificity required to give a prisoner notice of the charges against him could vary in

10  response to legitimate penological needs.  "[T]he Court has stated that in identifying the

11  safeguards due process requires in this context, courts should remember 'the legitimate

12  institutional needs of assuring the safety of inmates and prisoners' and avoid 'burdensome

13  administrative requirements that might be susceptible to manipulation.'"  *See Zimmerlee v.*

14  *Keeney*, 831 F.2d 183, 188 (9th Cir. 1987), *cert. denied*, 487 U.S. 1207 (1988) (quoting

15  *Superintendent v. Hill*, 472 U.S. at 454-55).  One legitimate concern for prison administrators

16  is the possibility that disclosure of certain information can endanger another inmate's safety,

17  such as might occur if prison administrators disclose the identity of a confidential inmate-

18  informant or disclose enough details about the information provided by such an informant

19  that the accused can figure out his identity.  *Cf. Wolff*, 418 U.S. at 568-69.  There are

20  affirmative and undisputed statements from declarant Thompson that disclosing the

21  information in the confidential memorandum to Plaintiff would severely endanger the safety

22  of numerous inmates, and would seriously threaten the ongoing prison investigation into the

23  organization and activities of prison gangs.  The Court finds that these legitimate institutional

24  concerns justify the denial of access by Plaintiff to the confidential memoranda in accord

25  with due process.

26      Plaintiff further argues that the evidentiary support for his validation is insufficient.

27  The Court has reviewed the confidential memorandum *in camera* and the two chronos, and

28  finds that they meet the "some evidence" standard, and that the evidence relied upon has

sufficient indicia of reliability.  With respect to reliability, the confidential memorandum contains information obtained by a correctional sergeant during a debriefing interview with a NS member.  The NS member identified Plaintiff as a member of the NS and stated how Plaintiff's status as a condemned inmate allowed him to be active in the NS.  This information met CDC reliability standards because other information provided during the interview was corroborated by separate sources, and the informant provided self-incriminatory information.  The non-confidential chronos are reliable insofar as the letters they rely upon were written by NS members and refer directly to Plaintiff, and the letters themselves were provided as part of the validation package.  Accordingly, the Court finds that the information in the memorandum and chronos is constitutionally reliable, that is, they contain some factual information from which the validating committee could reasonably conclude that the information was reliable.  Moreover, Officer Thompson has stated in his declaration that safety considerations prevent the disclosure of the confidential memorandum or the name of the informant.  *See Zimmerlee*, 831 F.2d at 186-87.

With respect to the requisite quantum of evidence, Defendants concede that although the two chronos indicate that Plaintiff has ties to the NS, "[t]aken alone, [they] . . . would not be sufficient to support Plaintiff Manibusan's validation as a member of the NS.  When considered in conjunction with the confidential material presented against Plaintiff, however, they support his validation." (Thompson Decl. at 4.)  Because the Court has found the memorandum to be a reliable source of evidence, it can be considered.  Moreover, the number of sources relied upon is not relevant to the federal due process analysis of whether there is "some evidence" to support the determination.  The state regulation's requirement of three separate sources is a matter of state law and does not dictate the outcome of the federal analysis.  Even a single source of information can be sufficient to satisfy the federal due process "some evidence" standard.  *See Bruce*, 351 F.3d at 1288.  The Court finds that Defendants have met the some evidence standard.

Plaintiff has failed to show that there is a triable issue of fact on his claim that he was not afforded due process when he was validated as a member of the NS prison gang.

9

<p style="text-align:center; writing-mode: vertical">**United States District Court**
For the Northern District of California</p>

1   Accordingly, Defendants' motion for summary judgment is GRANTED.

2   II.     Plaintiff's Cross-Motion for Summary Judgment

3           In his opposition to Defendants' summary judgment motion and cross-motion for

4   summary judgment, Plaintiff cites *Castillo v. Terhune, et al.*, C 94-2847 MJJ (N.D. Cal.), in

5   which the parties entered a settlement agreement on September 23, 2004, agreeing to certain

6   changes in the Department of Corrections' gang-validation procedures.  Plaintiff alleges that

7   his due process rights were violated because Defendants have not complied with the revised

8   procedures.  Defendants have attached a copy of the settlement agreement to their reply and

9   opposition to Plaintiff's cross-motion, and the Court's takes judicial notice of the settlement

10  agreement's existence.

11          The settlement agreement does not provide a basis for a § 1983 claim for relief

12  because it is not a determination that there was any constitutional violation in the gang-

13  validation process.  Moreover, a settlement agreement does not provide a right secured by the

14  Constitution or laws of the United States, the violation of which is a necessary element of a

15  § 1983 claim.  As a practical matter, the settlement agreement also does not aid Plaintiff

16  because he was not a party to it and it was made after the LEIU validated Plaintiff as a gang

17  member (that is, Plaintiff was validated as a gang member on December 3, 2002, while the

18  settlement agreement was not fully executed until September 23, 2004).  The settlement

19  agreement states expressly that its provisions shall be applied on a prospective basis only.

20  *See* Def.'s Ex. A at ¶ 25.  Although the settlement agreement contemplates changes in the

21  gang validation criteria, the settlement agreement itself acknowledges that it will take several

22  months for those changes to be implemented.  Finally, the agreement provides that,

23          There can be no individual inmate relief regarding an inmate's gang validation
24          granted through the [process set forth in the settlement agreement]; individual
            inmate concerns regarding his/her own gang validation can only be raised as
25          exemplars by [Castillo's] counsel of alleged noncompliance.  Individual inmate
            concerns must be raised through the California Department of Corrections
26          inmate appeals process (Cal. Code Regs. tit. 15, §§ 3084, *et seq*.) and separate
            suit.

27  *Id.* at ¶ 31(c).

28          Plaintiff's third level review was denied at the Director's Level on October 23, 2003,

<p style="text-align:center">10</p>

United States District Court

For the Northern District of California

1    almost a year before the settlement agreement was entered.  Thus, there is no practical way

2    he could have raised a challenge for failure to comply with the new procedures by way of the

3    administrative grievance process.  Accordingly, Plaintiff's cross-motion for summary

4    judgment is DENIED.[3]

5                                         **CONCLUSION**

6           For the foregoing reasons, the Court orders as follows,

7           Defendants' motion for summary judgment is GRANTED.  (Docket no. 16.)

8           Plaintiff's cross-motion for summary judgment is DENIED.  (Docket no. 27.)

9           Plaintiff's discovery motion is DENIED as moot.  (Docket no. 22.)

10          The Clerk of the Court shall enter judgment in favor of Defendants and against

11   Plaintiff and close the file.

12          IT IS SO ORDERED.

13   Dated: February 28, 2006

14                                                   _____

                                                     JEFFREY S. WHITE
15                                                   United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27   [3]This is not to say that Plaintiff cannot pursue his continued retention in the adjustment
     center under the "inactive review" provisions adopted by the Department of Corrections pursuant
28   to the settlement agreement.  Before coming to federal court, however, he must exhaust his
     administrative remedies. *See* 42 U.S.C. § 1997e.

11